## Case No. 17,680.

### WILLARD et ux. v. DORR.

### [3 Mason, 161.] [1]

Circuit Court, D. Massachusetts. May Term, 1823.

CAPTURE OF NEUTRAL SHIP — WAGES OF MASTER AND SEAMEN — ADMIRALTY PROCEDURE — SET-OFF — LACHES—TERMS OF HIRE — SERVICES AS FACTOR.

1. The master of a neutral ship which is captured, is bound to remain by the ship until condemnation, or a recovery is hopeless; and his wages after the capture and until the condemnation &c. are a charge to be paid by the owners, and ultimately to be borne, as a general average, by all the parties in interest.

[Cited in Copeland v. Phœnix Ins. Co., Case No. 3,210; The M. M. Chase, 37 Fed. 711.]

[Cited in Duncan v. Reed, 39 Me. 418.]

2. If a neutral ship after capture is condemned and sold, and afterwards on appeal the sentence is reversed, and freight for the full voyage is allowed in damages, it seems the seamen are entitled to full wages for the voyage. At all events, they are entitled to wages up to the time of the condemnation, if they remained by the ship so long.

3. If the master is guilty of smuggling in the voyage, if it is gross, it is a forfeiture of his wages for the voyage; and, at all events, any loss to the owner occasioned thereby, is to be compensated out of the wages of the master.

4. Courts of admiralty do not take notice of set-offs, except so far as they grow out of a maritime contract, submitted to its cognizance, and then principally by way of diminishing compensation, and not as an independent right.

[Cited in Bains v. The James & Catherine, Case No. 756; The Hudson, Id. 6,831; Dexter v. Munroe, Id. 3,863; The Two Brothers, 4 Fed. 159; Gillingham v. Charleston Tow-Boat & Transp. Co., 40 Fed. 650; The Journeyman, 60 Fed. 296.]

5. Courts of admiralty will not entertain suits upon stale demands. Twelve years' delay, unexplained, will affect a demand with the imputation of staleness.

[Cited in The Utility, Case No. 16,806; Bains v. The James & Catherine, Id. 756; Joy v. Allen, Id. 7,552.]

6. Shipping articles, being the proper and usual documents of the ship for the voyage, are in the admiralty always admitted as evidence of the terms of hire, even of the master, or his apprentice: but the evidence is not conclusive.

[Cited in Slocum v. Swift, Case No. 12,954; The Elvine, 19 Fed. 528.]

7. No suit for services performed by the master as a factor, or in any other character except that of master, is cognizable in the admiralty.

This cause [Case No. 17,679] came on again to be heard at this term, the respondent having put in a special answer; and upon a special replication thereto, the parties were at issue, and the points both of fact and law were argued at large.

---

[1] [Reported by William P. Mason, Esq.]

Mr. Hubbard, for libellant.

L. Shaw, for respondent.

STORY, Circuit Justice. It may be proper to state the leading facts of the case before I proceed to the consideration of the matters in controversy between the parties. The voyage originally undertaken by the ship Jenny, of which William Dorr was master, was a circuitous voyage from Boston to China, and back to the United States. The ship sailed from Boston on the voyage on the 5th of June, 1807. In the course of the voyage she stopped at Port Jackson, in the colony of New South Wales, and arrived at the Feegee Islands in the Pacific Ocean in May, 1808, and there disposed of the principal part of her cargo, and took on board a cargo of sandal wood; and sailed for China in September of the same year. Having sustained some injuries by tempestuous weather at a previous period, and the change of the monsoon approaching, it was judged proper before entering the Chinese seas, to stop for a supply of spars and other necessaries at the Island of Guam, one of the Ladrone Islands. Whilst lying there to refit, a quantity of beech de mer, beetle nuts, and deer horns were taken on board and added to the cargo. The ship sailed from Guam for China on the 10th of December, 1808, after a delay of about forty-five days, and was captured by a British cruiser on the 27th of the same month, and sent into Calcutta for adjudication. She arrived at Calcutta on the 4th of April, 1809; and after due proceedings had in the vice admiralty court there, she was finally with her cargo condemned on the 9th of June of the same year. Captain Dorr was sent in with the ship, and attended personally to her concerns in court and out, until the condemnation, when the ship and cargo were sold; and his apprentice was retained for the ship's service during the same period. An appeal was taken to the high court of admiralty, and Captain Dorr remained at Calcutta for the purpose of obtaining the necessary papers &c. until the 27th of December of the same year, and finally arrived at Boston on the 22d of March, 1809. Upon the hearing of the appeal, restitution of ship and cargo and freight were decreed by the high court of admiralty on the 16th of May, 1811, and a small part of the proceeds were then received. But in consequence of the delay of bringing the residue of the proceeds into court, and the intervention of the war between Great Britain and the United States, all farther proceedings were suspended until after the peace of 1815. In the spring of that year the proceeds were paid to the respondent's agent in London, and were finally received in America for the benefit of all concerned in November, 1816. Captain Dorr left the United States for Macao in July, 1810, and never afterwards returned, having died at that place in May, 1813.

These facts are not controverted by the parties. The libel asserts a claim for wages for the master up to the time of the capture, or departure for Guam; and for compensation to the master for services during the pendency of the proceedings, and until his arrival in the United States, as well as the expenses of his passage home. It also asserts a claim for wages for the apprentice up to the departure from Guam; and for his services afterwards on board the ship, until her condemnation. The answer of the respondents sets up a variety of defences, some of which go to the merits of the whole claim, and some only as set-offs to diminish the amount of compensation.

The first and most general in its nature is. that the demand is stale, and ought not (independent of any positive bar under any statute of limitations) to be entertained by the court, the lapse of time creating a presumption that it has been deemed settled by the parties, or that it has no foundation in justice or equity. I agree to the position, that courts of admiralty ought not to entertain suits for stale demands of wages. Although there is no prescribed limits beyond which, in the exercise of admiralty jurisdiction, the courts of the United States may not take cognizance of suits; yet it has been the constant habit of admiralty courts to refuse their aid in favor of old and dormant claims. Like courts of equity, they prescribe a rule to themselves, by analogy to those positively prescribed to courts of common law, beyond which, unless under special circumstances, constituting a just exception, they will not interpose. The repose of the commercial world requires this forbearance; for otherwise demands would perpetually spring up after the evidence to repel them was gone by the death, or dispersion of witnesses, or by the loss of important documents. So that lapse of time and acquiescence of parties constitute material ingredients in every claim, which is sought to be enforced through the instrumentality of tribunals of justice. Where there are no positive bars. presumptions are often indulged, which are equally fatal to a recovery. More than twelve years elapsed between the end of this voyage and the commencement of the present suit; and if the case stood upon ordinary grounds. such a delay unexplained would be decisive against the libellants. It would affect the demand with the imputation of staleness, and authorize the court to dismiss the libel.

But the circumstances of the present case appear to me decisive against the defence of staleness. It is true, that the original voyage was commenced in 1807, and the progress and fulfilment of it were entirely interrupted by the capture in December, 1808. The claim for wages may in a sense be said to have been complete by the maritime law for a period up to the last port of trade and delivery, which I consider to have been the Island of

Guam, and during half the time of the ship's delay there. The Two Catherines [Case No. 14,288]. If the conduct of the ship had been confined simply to the repairs and refreshments necessary for the prosecution of the voyage, there might have been some ground to have considered the Feegee Islands the last port of departure for the purposes of trade. But the purchase and taking on board of additional cargo at Guam. afford strong presumptions to my mind. that the stop there was not singly from necessity, but mixed with motives of interest subservient to the great objects of the voyage. But though the right to wages up to the last port of trade may be considered as earned under the maritime law; yet the right to those wages is acquired under a continuing contract for the whole voyage, and is not absolute until its regular termination. They may be forfeited for subsequent offences; and by the stipulations of our common shipping articles, are not payable until the voyage is ended. The contract then being for the whole voyage out and home, no presumption of satisfaction or extinguishment can ordinarily arise until after the termination of it by a return home. In the case before the court, a capture intervened, and produced, not an extinguishment, but a suspension of the contract. The seamen were, as has been repeatedly held by this court, bound to remain by the ship until condemnation took place, or a recovery became hopeless. The Saratoga [Id. 12,355]; Emerson v. Howland [Id. 4,441]. If upon the proceedings at Calcutta the ship had been acquitted, the seamen would have been bound to have gone on and completed the voyage upon the peril of the forfeitures attached by the maritime law to their original contract. She was condemned and sold; and certainly after that time they were at full liberty to depart and seek a new employment. Still, however, the condemnation was not final upon their rights to wages earned subsequent to the departure from the Feegee Islands or from the Island of Guam. By the restitution decreed upon the appeal the seamen were, at all events, entitled to their wages up to the time of the condemnation at Calcutta, if they so long remained by the ship. And if the restitution was decreed with freight for the whole voyage by way of compensation and damages, it seems to me they were entitled to wages for the whole voyage; for in such case, as freight is in effect earned for the whole voyage, there seems no reason why the seamen should not receive their wages for the same period, as such freight includes the expenses of navigation. That point, however is not now pressed upon the court, and may well be reserved for future consideration. The view which I wish to present on the present occasion is, that the contract for wages being for the whole voyage, it is to be considered as a continuing contract, until the termination of the voyage.

and the wages, though due at each port of delivery, as in some sort connected till such termination, and therefore not liable to be split into fragments by the interposition of any positive bar or limitation, or by any presumption of payment. Indeed, as has been already suggested, the clause in our common shipping articles suspends the payment until the close of the voyage.

The case of the master of a neutral ship upon capture is far more strong in point of right and duty than that of a common seaman. He has not only a right, but it is his imperative duty to remain by the ship until a condemnation, or all hope of recovery is gone. He is intrusted with the authority and obligation to interpose a claim for the property before the proper tribunal, and to endeavour by all the means in his power to make a just and successful defence. To abandon the ship to her fate, without asserting any claim, would be a criminal neglect of duty, and would subject him to heavy damages for a wanton sacrifice of the property. As therefore the law compels him to remain by the ship, and attaches him in some sort to her fate, he is entitled to receive compensation for his services, and this compensation is a charge to be borne in the first instance by the owner of the ship, and ultimately as a general average by all the parties in interest. His duties do not indeed cease even with condemnation; but he is to act for the benefit of all concerned; and if he should deem an appeal to be expedient, he is bound to enter it, and may, in his discretion, remain until copies of the papers are obtained, and other means of rendering the appeal effectual are concluded. The compensation for such services, and the incidental expenses, fall under the same predicament as those already adverted to. Upon these principles, I cannot but consider Captain Dorr entitled to wages from his original retainer to go the voyage until the condemnation at Calcutta. He was bound to remain by the ship during that whole period, and his wages must be coextensive in point of time with that obligation. He is also entitled to compensation for his services, as master, in effecting the appeal and procuring the necessary papers, and for the necessary prolongation of his stay at Calcutta for these purposes. For any other services performed by him, as agent or factor, independent of his character as master, he can have no claim here, for such claims are not within the cognizance of a court of admiralty.

As to some of these claims, he might certainly have demanded payment immediately upon his return home; as to others, the right, until the final restitution, might have been, and probably was, deemed doubtful. For instance, his title to wages, at least for a part of the voyage after leaving the Feegee Islands, might have been liable to great controversy, unless the decree of condemnation was reversed. That reversal, at all events, reinstated him in his rights. Looking to the whole circumstances of the case, I cannot say that there has been any unjustifiable delay. The restitution was not made until May, 1811, and the proceeds were not finally obtained until four years afterwards. Captain Dorr was abroad at the time of the restitution, and probably never had notice of it; and he died abroad two years before the decree became effectual. The fair inference deducible from all the facts is, that the parties were willing to leave the claims of Captain Dorr to be adjusted upon the final event of the appeal; and I cannot but think great indulgence is due to parties acting under circumstances of so much embarrassment and intricacy. The claim of the apprentice to wages, supposing it to be in other respects unobjectionable, stands on like principles. He was retained on board for the service of the ship, and as a guard against embezzlement, until the time of her condemnation; and is now entitled to wages at least up to that period, since the decree of restitution has reinstated the owner in his full title to freight.

Another objection to the recovery of wages both of the master and apprentice is, that there is no sufficient proof of the actual shipment of the latter for the voyage, nor of the terms and rate of wages on which either was engaged. It is admitted that the shipping articles contain their signatures and engagements for the voyage, with the monthly hire in the usual manner. But these articles, it is said, are not evidence in any controversy between the master and owner, but only in cases of the other officers and seamen. This distinction is perfectly novel in its character, and cannot, in my opinion, be sustained upon legal principles. The shipping articles constitute a part of the documents of the ship for her voyage, and are prima facie evidence in respect to all persons named therein. They are in no just sense the private papers of the master, but properly the documents of the owner, to which he must be presumed to have free access, and of the contents of which he cannot ordinarily be supposed ignorant. These articles invariably contain the contract of the master in respect to wages and the voyage, as much as of the seamen; and the terms of hire of the master and his apprentice, when found there, must be presumed to be perfectly sanctioned by the owner. If the latter wishes for any farther security than the ordinary integrity and interest of the master for his fidelity, he may and ought to take the precaution to possess a copy of the articles, or a distinct contract with the master. And in the customary orders for the voyage, it is not unusual to state, what the terms of the engagement of the master are in respect to wages and commissions. But prima facie the shipping articles are presumed to import verity, and to be as well known to the owner as master; and it is in-

cumbent on the owner, if he means to contest the fact, to offer some evidence of fraud, mistake, or interpolation. I wish to state this as a general rule applicable to cases of this nature. But so far as the case before the court requires any application of evidence, there really does not seem any reasonable ground for the objection. It is not doubted, that the master and apprentice went on the voyage: the compensation claimed as monthly wages is not attempted to be shown to be extravagant or unusual: and unless the court is to presume, that they volunteered their services without reward, which would be a most extraordinary and rash presumption, there is nothing in the claim, which upon a quantum meruit ought not to be decreed.

Another objection to the recovery is the allegation, that at Sydney Cove or Port Jackson in New South Wales. Captain Dorr was engaged in smuggling spirits, for which illegal proceeding the ship was seized and detained, and though finally released, expenses were incurred to the amount of $1,169.70. This is an independent allegation, and is of course to be established by competent evidence on the part of the defendant. Smuggling on the part of a master is a criminal departure from duty and a rank offence, calling upon the court for its most decided reprobation. Where it is gross in its circumstances, and attended with serious damage or loss to the owner, it is such a violation of the master's contract, as may be justly visited with the penalty of forfeiture of wages. And under the most venial and favorable circumstances, the damages actually sustained by the owner may be charged upon the wages of the master, and deducted by way of diminished compensation therefrom. But such misconduct is not to be presumed on the part of the master, and must be made out by reasonable proofs. It is certainly in proof in the case, that the ship was actually seized at Port Jackson, and that expenses were incurred on that occasion. But the ship was ultimately released, and this circumstance goes strongly to establish that the fact of smuggling, even admitting that this was the cause of seizure, was not maintained. If indeed there was any smuggling, as there was a supercargo, Mr. Francoeur, on board, who had the sole control of the cargo, and the direction of the voyage, it would still remain to be shown, that the master participated or connived at the act, and that it was his fault, and not merely his misfortune. Now there is no direct proof even of the act of smuggling. It is attempted to be made out by probable inferences from circumstances not very cogent; and it is denied both by Mr. Francoeur and the master in their depositions in preparatorio. The seizure is by them attributed to another cause, there being a convict found secreted on board, who came there without their knowledge or connivance. There is this additional circumstance, that this very claim was in 1816 brought by the defendant before the commis-

sioners appointed upon Captain Dorr's estate under a commission of insolvency, and upon full consideration was by them rejected. Whether this rejection of the claim would in all cases be conclusive, need not be here determined. It is sufficient to say, that the decision of the commissioners is entirely in coincidence with the opinion of this court; and fortifies every conclusion, which the evidence before it would now justify it in entertaining.

The remaining questions respect the set-offs asserted by the defendant, as matters of counter claims. Some of these are properly before the court, as partial payments of wages and advances in the voyage; but others are debts and claims of a wholly independent nature. Now in respect to the latter, I am utterly at a loss to know, how they can be properly brought within the cognizance of this court. Most of them are not of a maritime nature; and even if they were, as they do not grow out of the maritime contract, on which the libel is framed, it is difficult to perceive, how they are founded in point of jurisdiction. Courts of admiralty are not invested by statute with any authority to hold plea of set-offs generally. Wherever they do entertain such claims, it is upon general principles of equity, where the claims attach to the particular maritime demand, submitted to their cognizance by the libel, and not upon any notion of a right to enforce such set-offs, as are now recognized and enforced in courts of common law under statuteable provisions. The set-offs allowed in the admiralty are principally those, in which advances have been made upon the credit of the particular debt or demand, for which the plaintiff sues; or which operate by way of diminished compensation for maritime services on account of imperfect performance, misconduct, or negligence; or as a restitution in value for damages sustained in consequence of gross violations of the contract for such services. The duty of the court is clear, therefore, and it ought not to entertain any jurisdiction over such set-offs. As, however, the questions have been fully argued by counsel, and these same claims were presented to and rejected by the commissioners of insolvency, I shall take the liberty of expressing in a few words my own opinion respecting them, which, indeed, coincides with that of the commissioners.

As to the notes of Captain Dorr for $270 and $75, it now appears, that the former was given for the advances made by him at Calcutta, and for which he drew exchange on the respondent in favor of Rammohun Roy. These advances were for the master's expenses at Calcutta, and are certainly a proper charge on the ship owner. They have been allowed by the underwriters as such, and paid to the respondent. This note, therefore, as well as the dependent claim for the money advanced by Rammohun Roy, vanishes as a subsisting charge against Captain Dorr. The same may be said of the other note for $75, which was given by Captain

Dorr for advances made for his passage money and expenses home by the way of New York. These expenses were also payable by the owner. Indeed, these notes confirm the view already taken by the court, that there never was any settlement really had between Captain Dorr and his owner for the proceedings of the voyage, but that it was postponed until the event of the appeal should be ascertained. In any other view of the facts, the court would be obliged to come to the conclusion, which it would be very reluctant to do, that an improper advantage had been taken of Captain Dorr's necessities, or that he acted under the grossest mistake of his legal rights. I do not choose, without a full warrant, to indulge in such a conjecture. The facts admit of a more liberal and just explanation. The other note for $35 is admitted to be due, and no objection is urged against the deduction of the amount from the present demand.

Then comes the claim for fifty-eight kegs of lard, part of the cargo, which it is alleged were lost, and not accounted for by Captain Dorr. In the first place, the whole cargo was consigned to Mr. Francoeur, the supercargo, and he alone is responsible to account for it. The master, as such, had no control over it; and it is not shown, that any part of it was lost or injured by his misconduct. In the next place, the answer of Mr. Francoeur to the standing interrogatories establishes, that in point of fact it was embezzled by the captors. If so, there is no pretence to charge the master with the loss, unless the embezzlement was by his connivance, which has not been in the slightest degree hinted at. The next item is for palanquin hire, and for wine used at Calcutta. The former, I believe, is no unusual or unreasonable expense in East India voyages; and the latter, if not indispensable, was not deemed improper under the circumstances, by Mr. Francoeur, the agent of the owner, who was on the spot, and made the advances for this purpose. In the absence of all proof, that these expenditures were unjustifiable or extravagant, the court must presume them to be correct. The item of $19 for money advanced by Mr. Carrington appears to have been in payment of the expenses of the protests at Calcutta, and if so, was a charge on the owner.

The only remaining item, which requires any particular notice, is that of $160 for clothing, tools, and other articles asserted to have been supplied to Captain Dorr and to his apprentice, during the voyage, out of the property on board belonging to the ship owner, or for which he was responsible. The apprentice, in his deposition, utterly denies having received any such supplies; and there is no proof to contradict his testimony. This claim, therefore, falls to the ground, as unfounded in fact.

Upon the whole, I shall decree that the libellants shall recover wages and compensation for services according to the principles already stated. Of course the advance wages and equita-

29 FED. CAS.—81

ble claims are to be deducted. Decree accordingly.

The minute for the decree was as follows:

| | |
|---|---:|
| Captain Dorr's wages from 22d of May, 1807, to 7th of June, 1809, at $50 per month, 2 years and a half month... | $1,225 00 |
| Compensation in the nature of wages for services as master, from 7th of June (time of condemnation) till departure for home, say 7th November, 1809, 5 months, at $50..... .......... | 250 00 |
| James Powell's (the apprentice) wages from 5th of June, 1807, to 7th of June, 1809, 2 years, at $12 per month............................... | 288 00 |
| | $1,763 00 |

Deduct Cr.

| | | |
|---|---:|---:|
| Cash paid master as advance wages........................... | $100 | |
| Cash paid apprentice as advance wages.................... | 24 | |
| Note for cash lent.............. | 35 | |
| | $159 00 | |
| Note of 4th of May, 1810, for general average (if produced and proved).... | 164 72 | |
| | | 323 72 |
| | | |
| Balance............................. | | $1,439 28 |
| Interest from 13th of April, 1822 (the commencement of the suit) to 13th of June, 1823, 2 years and two months, on $1,439.28................ | | 187 09 |
| | | |
| Whole amount..................... | | $1,626 37 |

The sum of $250 was paid by the underwriters to the defendant for the master's services at Calcutta.