By the Court,
Robertson, Ch. J.
The plaintiffs in this case were .entitled prima facie to recover, upon the defendant’s covenant under seal, the monthly stipend of the decedent provided for therein, upon proof of its execution, of the decedent’s services, and his inability to continue them, caused by acts beyond his control. The elaborate argument of the learned counsel for the defendant, as to the absence of any liability of a mere mortgagee in possession of a vessel, for the pay of her master or crew, quite applicable, perhaps, in case of a parol contract of employment, is wholly beside this case. The defendant, if not an owner, became a surety by such covenant, and could avail himself of any privilege to which he was entitled as such, but to no others, except those arising out of the contract itself. It is true, many considerations *595 were admitted into the case upon the trial, as if the contract were only by parol; but as the consequences of its being under seal were not waived, all evidence of the mere agency of the defendant was immaterial, and properly excluded.
So positive a sealed agreement must necessarily control any general rules of law as to the power, rights and duties of masters of vessels, if they in any way conflicted with it. So that the tenability of the objection to the plaintiffs’ recovery upon the ground that the contract was entire, and that they could not recover any thing, because the intestate had not completed the voyage out and back, would be rendered somewhat doubtful by the provision, that his compensation was to be a certain sum “ per month for each and every month.” There is nothing in the covenant itself to make such payments depend upon the completion of the whole voyage, or the captain (the original plaintiff) take upon himself the risk of her ability to perform it. At all events, any such omission by the defendant to have such vessel properly fitted for such voyage, as might ultimately be the cause of defeating it, or any subsequent occurrence beyond the plaintiffs' control, which broke it up, would excuse him from performing it, and still leave him a right of compensation during his actual service.
There is no qualification in the defendant’s covenant making his liability to depend upon the earning of freight by the vessel, and therefore the failure to earn it did not deprive the plaintiff of compensation. Hor would he lose it in case of an ordinary employment of him by parol. Like most proverbs, the proverbial expression, that “freight is the mother of wages,” is not universally true, even in regard to seamens’ wages, (The Massassoit, .7 Law Rep. 522 ;) still less does it affect the compensation of the master, which is not properly wages. He is not supposed to trust to either vessel, cargo or freight, and therefore has no lien upon either for his pay. Indeed not even for his advances, in England, (Smith v. Plummer, 1 Barn. & Ald. 575 ;) although otherwise as to freight, in this state, (Van Bokkelin v. Ingersoll, 5 Wend. 315;) but not on the ship. (Ship Grand Turk, 1 Paine C. C. 73.) *596 Even his contract is held in England, not to be a subject of admiralty jurisdiction, (Ragg v. King, 2 Stra. 159 ;) although' a different rule is adopted in this country. (Willard v. Dorr, 3 Mason, 161.) The stimulus to duty of ordinary seamen, by making their wages depend upon the success of the voyage in earning freight, is not needed in the case of a master. •Sufficient safeguards for his vigilance and fidelity are found in his greater intelligence, skill and experience, as well as his character and position, which makes him fear a loss of reputation, to say nothing - of his being generally able to respond in damages for any injury caused by his neglect or ignorance. His rights rested solely on the terms of his contract, with which the earning of freight had nothing to do.
It will hardly be necessary to consider any question of damages for which the captain was liable, short of a forfeiture of his pay. For, in the first place, it is not clear that the defendant, being a mere surety, could recoup such damages, which might be the subject of a separate action by the owners ; in the nest place, no claim thereto is made by the answer, nor was the presiding judge requested to submit the question of them to the jury. Although, in fact, he did instruct them to deduct from any amount due the plaintiffs, any damages to which the owners were entitled by reason of the captain’s misconduct, particularly by-the deviations from the destined voyage, the failure to repair at Port Louis, and neglect to send back proper information to enable the owners to recover the amount of insurance, if they were the result of it.
The learned judge, however, left it to the jury generally to say whether “ the voyage was broken up by reason of the negligence, unskillfulness, fault or fraud of the captain,” and if they go found; he instructed them to find a verdict for the defendants; besides directing them to deduct the amount of certain damages from any sum due the captain. He even went so far as to say, that they were to deduct therefrom damages caused by deviations from the original route, although they might not have contributed to her irltimate loss, provided *597 they went beyond the value of the vesseland even for any neglect to send home books and documents necessary to substantiate claims for insurance. This was certainly as favorable a charge for the defendant as he was entitled to. For neither by the common or maritime law, could any act of the master, which did not go to the whole consideration for the promise to pay him,- such as breaking up the voyage or rendering it entirely unprofitable, deprive him absolutely of his pay.
In this case the justification presented of the master’s nonperformance of his contract, consisted of the condition to which the vessel was reduced by a storm, after leaving Cape Town, and his inability to have her repaired at Port Louis, in which he was compelled to seek shelter ; and his consequent compulsory abandonment of her there to the underwriters. Her sale, under the libel by the seamen, was a mere consequence of the same combination of circumstances. . The statement in the complaint, and the evidence of the seizure of the vessel, in order to satisfy a 'bottomry bond, was wholly immaterial upon the question of justification of the master’s conduct.''
Much of the evidence on the trial was upon matters not appearing in the pleadings, and upon issues hardly raised by them. Evidence was admitted of an insufficient equipment of the vessel on her departure from New York, which was nowhere alleged in the pleadings, but was the first moving cause of her final loss ; this led to evidence as to the condenser and its availability. Perhaps the answer tendered such issue by alleging the needlessness of the deviation to Bahia, and claiming that such deviation caused the encounter with the storm and subsequent deviation to Port Louis, with all their consequences. The evidence, however, as to the impossibility of procuring at Port Louis the necessary means of repairing such vessel, the costliness of such repairs, and the sale of her under the decree for seamens’ wages, with proof of all the proceedings in admiralty, although not warranted by the pleadings^ seems to have been admitted by tacit consent. These matters were undoubtedly material to the parties’ rights, *598 as involving the propriety of the captain’s course, and the pleadings, if necessary, may be made to conform to the material facts established by such evidence.
There was abundance of evidence on the trial to show the unseaworthiness of the vessel on her departure from New York, in the deficiency of spars, rigging, small boats, ballast and water. An insufficient supply on board of the last would not be made up by having a condenser : which might get out of order as it did in this case. If it was in working order, the constant use of it might be proper to repair the consumption, in order to meet extraordinary contingencies, and a knowledge of its use might be requisite in a skillful captain. But no question of that kind could arise in this case, since the machine became useless, until which time it was worked properly. The abandonment and sale of the vessel, caused immediately by the storm, and indirectly by the deviation to Bahia, is, therefore, ultimately to be attributed to the original deficient equipment of the vessel. And there is no room for dispute on that subject, from the evidence.
There was opposing evidence offered to outweigh the evidence given on the trial, of the damage to the vessel in question by the storm encountered by her, of her being rendered unfit thereby to go to sea from Port Louis on her destined voyage; of the unprofitableness of repairs to her there, and the impossibility of procuring funds for her there for that purpose; of her survey by the captain of the port, assisted by three other shipmasters, her condemnation and consequent abandonment to the underwriters ; the attempt at selling her thereafter, and subsequent sale under the decree of the court of admiralty in the suit by the crew for their wages. All the facts, which such evidence, therefore, tended to prove, must be assumed to have been found by the jury. If so, they form a perfect justification of the desertion of- the vessel by the plaintiff.
The sale of the vessel under the decree in admiralty, of course would only have formed such justification, in case it was inevitable; that is, if no legal resistance could have been *599 made to it, or any proper resistance offered was overruled by the positive decision of the court. If the voyage was terminated, even although by the master’s misconduct, the seamen would probably be entitled to their wages, and the remedy of the owners would be against him only, since there was still a right to freight pro rata itineris. But if such voyage was terminated by necessity, a fortiori, they would be entitled to their wages, and the question of necessity might therefore arise in such a case. (Abb. on Ship. 632, marg. p. The Neptune, 1 Hagg. Ad. R. 227. The Dawn, 26 Am. Jur. 216.) So far as the shattered condition in which she arrived at Port Louis is concerned, the plaintiff is exculpated, as I have shown, by the finding of the jury. It only remains to be seen whether she could have been repaired and sent to sea upon her voyage.
Efforts of the plaintiff to raise money for repairs were proved, and the defendant failed on a cross-examination of the witnesses to shake their statement or show that money could have been raised at that place for the purpose. For that reason, as well as on account of the difficulty of procuring the repairs and the unprofitableness of them as they would exceed half the value of the ship, the captain was justified in abandoning her to the underwriters and acknowledging in court that the wages of the crew were due.
I do not find any errors in the admission or rejection of evidence on the trial, or giving or withholding any instruction from the jury. The refusal to charge absolutely, that as matter of law the deviations were fatal to the plaintiff’s right of recovery was correct. The instruction given, which left the propriety of such deviation as matter of fact for their consideration, was all the defendant was entitled to. The refusal also to permit the jury to decide whether Port Louis was the nearest and best port or harbor to which to navigate the vessel after her disaster was also proper, when the only evidence on the subject was, that it was the nearest civilized port, and even if Madagascar was nearer, “nothing could have been done or got there.” The refusal also to charge that the want of water was no excuse for any deviation if the con *600 denser was capable of producing water enough for the persons on board, was also proper, since there was uncontradicted evidence in the case that it was out of order, incrusted on the inside with salt and the whole apparatus so warped as not to be capable of working. The instruction that if such condenser “ was in good order and of sufficient capacity to supply water,” and they were “'in general use in 1853, the captain was bound to know how to use it and there was no necessity to put into any port to obtain water” embraced every point necessary to be submitted.
The abandonment of the vessel and consequent termination of her voyage growing out of her crippled condition and want of means to repair her, took place before any seizure of her under admiralty process.
Making the proper .intendments to sustain the verdict, it must be assumed that they found under the instructions to them, the following facts :
First. That the first deviation to Bahia was caused by a. want of water or ballast, or both, and that such want of water was caused by an original insufficient supply, which ' deficiency could not be remedied by the use of the condenser. And that the stay at such place was not unreasonable.
Second. That the stopping at Cape Town was due to a similar failure of water, and the stay there was not unreasonably long.
Third. That the putting into Port Louis was rendered necessary by the injury received from the storm encountered.
Fourth. That the expense of repairs at Port Louis would have exceeded half the value of the vessel, and the plaintiff could not, with due diligence, have obtained funds to pay for such repairs, and her abandonment to the underwriters became thereby necessary.
Fifth. That the termination of such voyage by the abandonment of such vessel, and its acceptance, was not caused by any default on the part of the master.
Some questions seem to have been.raised on the trial growing out of the evidence adduced to establish a liability of the *601 captain for damages for neglect after the sale of the vessel; the first being that he did not defend the suit brought by the holders of the bottomry bond. The breaking up of the voyage entitled them to recover therein, notwithstanding the delay provided for therein, until after the arrival at Australia. (The Draco, 2 Sumn. 157, 193. The Catharine, 15 Jur. 232. The Heligoland, 5 id. N. S. 1179. Swab. Adm. R. 499.) Another ground of complaint was that the plaintiff did not send to the owners information and documents necessary to enable them to recover insurance. The facts of such transmission and of any excuse for its omission were submitted to the jury. The question of damages by any act or omission of the plaintiff was also submitted to the jury generally as a subject of deduction from Ms claim, although no allegation of such damages was contained in the answer. And they evidently found against it. But no special question of damages from an omission to forward information or documents, was submitted to the jury as supposed in the points for the defendant.
I am compelled to differ with the learned judge, before whom the cause was tried, in regard to the period of time, for which the plaintiffs ought to have recovered the compensation of the decedent represented by them. Of' course all connection by him with the. vessel, as its master, ceased with its sale, and any subsequent agency as to its proceeds, or the cargo, or the business connected with the voyage, ceased with his departure from Mauritius. After such sale he did not act as master, but as a mere agent, with probably diminished services and responsibility. For such services he was only entitled to a reasonable compensation. (Johnson v. Wissman, 5 N. Y. Leg. Obs. 18. Willard v. Dorr, 3 Mass. Rep. 161. Oxnard v. Dean, 10 id. 143. Smith v. Tryon, 4 Day, 105. Eaken v. Thorn, 5 Esp. 6.) But the difficulty in this case is to determine what allowance shall be made. The rendering of such services, when left in a distant port remaining necessarily without means, unable to make any new bargain for his pay, and obliged to look after the' sale and proceeds of the vessel, as was required in this case, would seem prima facie to entitle *602 the captain to a continuance of the same pay as if at sea, and make it incumbent on the owner to prove any diminution in value and its extent. This, however, would not extend to the time of a voyage home," although he might be perhaps allowed his expenses, but of them there is no proof in this case, and perhaps also any enforced stay even after the affairs of the ship were settled. Most of the cargo appears to have remained unsold until the master’s departure for Hew York, in May, 1854, requiring of course some attention from him until then. The plaintiffs are not entitled to recover any pay beyond that time with interest until the time of trial.
The judgment must be affirmed without costs, if the plaintiffs consent to reduce the verdict and judgment, by deducting the decedent’s pay from May, 1854, to the time of his arrival in Hew York; otherwise it must be reversed, and a new trial granted. (a)

 This case has been lately substantially affirmed in the Court of Appeals, except as to the time of compensation,.