## Case No. 4,057.

### The DRACO.

[2 Sumn. 157.] [1]

Circuit Court, D. Massachusetts. May Term, 1835.

ADMIRALTY JURISDICTION—BOTTOMRY BOND GIVEN BY OWNERS—LIEN — RECORDING — BONA FIDE PURCHASERS—SALE OF VESSEL—TROVER AGAINST VENDEE.

1. A valid bottomry bond may be made by the owners of a vessel, in a foreign or a home port.

[Cited in Vandewater v. The Yankee Blade, Case No. 16,847.]

2. The admiralty has jurisdiction over all maritime contracts in personam; and also in rem, where there is a maritime lien or express pledge, as security; and this embraces, of course, a bottomry bond, given by the owner in the home port, where there is an express pledge, as security.

3. It is not necessary to the validity of a bottomry bond, made by the owner of a vessel, that the money borrowed should be advanced for the necessities of the ship, or cargo, or voyage; though it would be otherwise, where the money was borrowed by the master, virtute officii.

[Cited in Leland v. The Medora, Case No. 8,-237; The Panama, Id. 10,703. Criticised in Greely v. Smith, Id. 5,750.]

4. A bottomry bond is a contract for a loan of money on the bottom of the ship, at an extraordinary interest, upon maritime risks, to be borne by the lender, for a voyage or a definite period.

[Cited in Leland v. The Medora, Case No. 8,237; Morrison v. The Unicorn, Id. 9,849; The Grapeshot, 9 Wall. (76 U. S.) 135; The Rapid Transit, 11 Fed. 325. Criticised in Greely v. Smith, Case No. 5,750.]

5. An hypothecation of a vessel, on maritime risks, draws after it a maritime lien.

[Cited in Greely v. Smith, Case No. 5,750; Delaware Mut. Safety Ins. Co. v. Gossler, Id. 3,766.]

6. A bottomry bond need not be recorded under the statute of Massachusetts (1832, c. 57) which provides for the registration of mortgages of personal property.

[Cited in Leland v. The Medora, Case No. 8,-237.]

7. A valid bottomry bond will be upheld, where there are no laches on the part of the lender, even against a bonâ fide purchaser, without notice.

[Cited in Delaware Mut. Safety Ins. Co. v. Gossler, Case No. 3,766.]

8. A bottomry bond may be upon time, as well as upon a specific voyage.

9. If, after the risk on a bottomry bond has commenced, a sale or transfer of the vessel takes place, or the voyage is in any manner broken up by the borrower, the maritime risk terminates, as in the case of a policy of insurance, and the bond becomes presently payable.

[Cited in Leland v. The Medora, Case No. 8,-237; Greely v. Smith, Id. 5,750; Morrison v. The Unicorn, Id. 9,849.]

---

[1] [Reported by Charles Sumner, Esq.]

10. Where it was expressly stipulated in a bottomry bond—"that the said brig, shall be delivered to no other use or purpose whatsoever, until payment of this bond is first made;" *held,* à fortiori. that a sale of the brig, after the commencement of the maritime risk, terminated the risks under the bond. and entitled the lender to an immediate right of action.

11. Trover would lie at common law, in favor of the lender on bottomry, against the vendee of the vessel, who, after the commencement of the maritime risk, and before the satisfaction of the bond, had taken possession of the vessel.

[Followed in Greely v. Smith, Case No. 5,750.]

Libel in admiralty by the Tremont Insurance Company, a corporation created under the authority of a charter from the commonwealth of Massachusetts, against the brig Draco, upon an asserted bottomry bond. The claimants, Messrs. Stanton, Nichols and Whitney, assert in themselves title as vendees, and also other matters of defence.

The bond in question was executed by the owners in Boston, the home port of the brig, to the Tremont Insurance Company, on January 6th, 1834, while the brig was still at sea. The following is a copy of it:

"Know all men by these presents, that we, James P. Flint, Jacob C. Flint, and Sherman G. Hill, merchants and copartners in trade under the name and style of P. & C. Flint & Co. as principals, and Rufus G. Norris & Joseph W. Flint, merchants and copartners in trade, under the name and style of Norris & Flint, as sureties, are held and stand firmly bound and obliged unto the Tremont Insurance Company, of Boston, in the county of Suffolk, and commonwealth of Massachusetts, in the sum of six thousand dollars, money of the United States of America, to be paid to the said Tremont Insurance Company, their certain attorney, successors, or assigns, to which payment well and truly to be made, we bind ourselves, each of us, and each of our heirs, executors, administrators, and assigns, and each and every of them, jointly and severally, and firmly, by these presents.

"Dated at Boston, this sixth day of January in the year of our Lord, one thousand eight hundred and thirty-four.

"Whereas, the Tremont Insurance Company aforesaid. have this day lent and advanced unto the said P. C. Flint & Co. the full and just sum of three thousand dollars, which is to run on bottomry on the block, tackle and apparel of the brig Draco of Boston, whereof —— is master, and of which the said P. & C. Flint & Co. are the owners, to be employed as follows: At and from the —— to, at and from all ports and places to which she may proceed for one year, commencing the risk on the sixth day of January, one thousand eight hundred and thirty-four at noon, and to continue until the sixth day of January, one thousand eight hundred and thirty-five at noon, and no longer, unless she should be on a passage at that time, in which case the risk is to continue, until her arrival at her port of destination, and the said obligors are to pay to the said Tremont Insurance Company, interest, at the rate of six per cent. per annum, on the sum loaned, to be paid semi-annually, at the said company's office, in Boston, and a further premium of five per cent. on the marine risk of three thousand dollars, on the said brig, valued at ten thousand dollars, for the term of one year, commencing the risk on the sixth day of January, one thousand eight hundred and thirty-four, and to continue till the sixth day of January, one thousand eight hundred and thirty-five, and at pro rata premium, if on a passage, until the same shall be ended.

"In consideration whereof, the casualties of the seas, and all other risks enumerated in the printed form of policies, now in use, by the said Tremont Insurance Company, are to be on account of said Tremont Insurance Company, and for the further security of the said Tremont Insurance Company, the said P. & C. Flint & Co. doth by these presents mortgage and assign over to the said Tremont Insurance Company, the whole of the said brig, and it is hereby declared, that the whole of the said brig is thus assigned over, for the security of the bottomry taken up by the said —— and shall be delivered to no other use or purpose whatever, until payment of this bond is first made, with the premium and interest that may become due thereon. And said Tremont Insurance Company is to be entitled, in case of loss, to the whole of the salvage of said brig, which the said obligors hereby promise to pay to the said Tremont Insurance Company.

"Now the condition of this obligation is such, that if the above-bounden James P. Flint, Jacob C. Flint, and Sherman G. Hill, Rufus G. Norris and Joseph W. Flint, their, or either of their heirs, executors, administrators or assigns, shall and do and well and truly pay, or cause to be paid to the said Tremont Insurance Company, their certain attorney, successors or assigns, the full and just sum of three thousand dollars, being the principal of this bond, together with the premium and interest that shall become due thereupon, at the time of the safe arrival of the said brig at her port of destination, in manner aforesaid; and in case of loss of the said brig, shall pay the whole of the salvage to the said Tremont Insurance Company, then this obligation to be void, otherwise to remain in full force and virtue."

The libel, after stating the substance of the instrument, and annexing a copy of it, proceeds to state, that in July, 1834, the sum of ninety dollars had become due on the loan, and had not been paid; that after the execution of the instrument, and in the same month of January, 1834, the firm of P. & C. Flint & Co. (the borrowers on the bottomry) transferred and assigned the vessel to the present claimants, contrary to the stipulations in the

instrument; that the claimants deny the interest and lien of the libellants in and on the vessel, and insist upon their free and unincumbered title; that the vessel is about to proceed to sea on a foreign voyage; that Flint & Co. have become insolvent, and utterly unable to pay the bond; and that, by reason of the premises, the bond has become forfeited, and they therefore pray admiralty process against the vessel, and that she may be sold to pay the sums due to them. The answer of the claimants admits the execution of the bond, and the sale to themselves; and insists, that the court has no jurisdiction, because it is not, in fact, a bottomry bond; that the brig was at sea, when it was given; that the sum lent, was not lent to fit out, or repair or supply the brig. or to purchase a cargo for her, or for any purpose connected with any voyage, or the navigation of the brig,—but for the general purposes of the firm, in their trade and negotiations as merchants, then residing in Boston; which facts were at the time known to the libellants. The answer further insists, that the libel is not maintainable, because the sum loaned had not as yet become due, according to the terms of the instrument; that the claimants, on the 14th of January, 1834, purchased the brig of the firm for the sum of $6,006, the brig being then at sea, on a voyage from Russia to Boston; that a bill of sale was duly executed and lodged at the custom-house in Boston immediately after its execution; that the brig arrived at Boston in February, 1834, and was immediately taken possession of by the claimants, who took out a new register, and chartered her to Enoch Train and Charles W. Cartwright, in the same month of February, 1834. on a voyage for South America, on which she sailed in a few days afterwards; that the claimants at the time of the purchase of the brig. had no notice of the asserted bond, nor until after the brig had sailed on the said voyage, and then only casually; and the libellants gave them no notice of it, until the commencement of the present suit; that on the arrival of the brig from Russia, in February, 1834, the libellants did not take possession of her, never took any bill of sale of her, and never caused their bond to be recorded in the office of the city clerk of Boston, and never caused any endorsement thereof upon her register. A general replication was put in, denying all the facts in the answer; but in point of fact, as from the subsequent proceedings, it appears, the parties admit all the material facts to exist, which are stated in the original libel and answer, except that the libellants deny, that they knew that the loan was not to be applied to pay for the expenses of the vessel or her lading. The amendments principally bring forward collateral matters, asserting that the title of the claimants is not absolute, but a mere mortgage, and asking an account of the freight and other proceeds, and other matters consequent upon new allegations; to which the supplemental answer replies in a suitable manner.

Mr. Sprague, for libellants.

Mr. Sprague said, that for what he had to offer he was indebted almost entirely to his young friend, F. C. Loring, whose brief had been transferred to his hands merely because that gentleman could not address the court.

First. Bottomry bonds may be legally made at home. The practice has existed from the earliest periods of commerce, is authorized by the ancient and modern codes of sea laws. is recognised in the laws and usages of all commercial nations at this day, in all elementary works, and is expressly authorized by the statutes of Massachusetts. There is no distinction between bonds made by an owner or a master. except that a master's authority is limited; between bonds made for voyages, or years. It is necessary that the loan should be used for lading the ship. Bynk. 506; Abb. Shipp. 118; Ordinance of Louis XIV. lib. 3, tit. 5; Code du Commerce, art. 312; 2 Browne, Civ. & Adm. Law, 196; 3 Dane, Abr. 114; 1 Phil. Ins. 302; Park, Ins. 410; 2 Pet. Adm. 295 [Wilmer v. The Smilax, Case No. 17,777]; Conard v. Atlantic Ins. Co., 1 Pet. [26 U. S.] 386; Thorndike v. Stone, 11 Pick. 183; Appleton v. Crowninshield, 3 Mass. 443, 8 Mass. 340.

Second. If bottomry is a maritime contract, it is a corollary, that this court has jurisdiction, especially as it alone can give relief, and effect the intention of parties, by enforcing the lien. The lender might have a remedy at common law by an action of trover or assumpsit. Hurry v. Hurry's Assignees [Case No. 6,922]; Busk v. Fearon, 4 East, 319; Franklin Ins. Co. v. Lord [Case No. 5,057]. But this would be only against the person. The essence of the contract is. that the loan is made on the security of the thing; the credit is given to that, not to the borrower. The jurisdiction of admiralty over a bond like this, has been denied in England, because the common law courts claim exclusive jurisdiction over them, and have power to prohibit the admiralty courts; not because the subject-matter is not fit. All the authorities to this effect are in the common law reports; in the admiralty reports there is no intimation of any disability or disinclination. And it is doubtful, if the common law courts would interfere at this time. The Barbara, 4 C. Rob. Adm. 1; Corish v. The Murphy, 2 Browne, Civ. & Adm. Law, 530, Append. But it has been frequently declared, that the limited jurisdiction of the English admiralty is no rule for this court. De Lovio v. Boit [Case No. 3,776]; The Jerusalem [Cases Nos. 7,293 and 7,294]; Wilmer v. The Smilax [supra]; The Mary [Case No. 9,187]. Other cases are, however, contrary; but they were decided under circumstances, which weaken their authority, so far as the present point is concerned. See The Charles Carter, 4 Cranch [8 U. S.]

428; Forbes v. The Hannah [Case No. 4,925]; Hurry v. The John & Alice [Id. 6,923].

Third. The bond is forfeited, and the bottomry loan turned into a simple loan by sale of the vessel. The sale of a vessel, subject to a bottomry bond on time. is, ipso facto, a forfeiture of the penalty. The contract of bottomry is often compared to that of insurance. In insurance, if the risk is not commenced, the contract is dissolved; in like case, a bottomry loan becomes a simple loan. In the case of a deviation, insurers are discharged, and a bottomry becomes a simple loan.* If the loss be occasioned by the barratry of the master, or the misconduct of the owners, the insurance is discharged; bottomry becomes a simple loan. In both contracts there are the same general principles; therefore, as by a sale of the vessel the insurers are discharged, so by a sale without consent, the bottomry becomes a simple loan. The general principle is the same in cases of insurance and of bottomry; that any acts of the owner, by which the risks are increased or changed, is a dissolution of the contract. The sale and delivery of this vessel to the claimants (contrary to the express stipulation and agreement of the parties to the contract). was a change of the risks, assumed by the lender, which would of itself, without any express agreement, have avoided a policy of insurance, and on the same ground would have reduced a contract of bottomry to a simple loan; and the present case is much stronger, because the lender agreed to make the loan on the express stipulation, that the vessel should not be sold, which stipulation, without their knowledge or consent, has been broken by a conveyance to third parties, acknowledging no right in these libellants, and who have compelled them to pursue their remedy at law.

Fourth. Can the rights of the lenders be defeated by a transfer of the vessel to an innocent third party? or, in other words. can the breach of an express agreement, and consequent moral obligation, by one man, have the effect to deprive another of his property? The libellants gave no credit to the borrowers; they trusted to the vessel. The claimants bought her on the faith of the warranty of the borrowers, and therefore it was they, who gave the credit to the borrowers, and they must bear the consequences of their own misplaced confidence. By every definition of a bottomry bond, it appears, that the vessel is hypothecated for payment of the loan, and that when the loan becomes due, the lender has the security of the vessel as well as of the borrower. By all authorities on the subject, it is declared, that a bottomry lien takes precedence of all others, except a few particularly favored, such as mariners' wages. There is no authority, as well as no reason, which declares, that a bottomry lien is defeated by a transfer of the property. It is impossible to suppose, that this contract, which has been in

constant practice for centuries, and on which millions have been loaned, should have ever been in use at all. if the security created by it could be defeated by a mere transfer of the vessel by the borrower. The law is laid down fully and unqualifiedly by Parker, J. in Appleton v. Crowninshield, 8 Mass. 359.

I have endeavored to show, that the bond in question is a legal bottomry bond, subject to the jurisdiction of this court, reduced to a simple loan, and made immediately due by the breach of the agreement not to deliver the vessel to any other use till the bond should be paid. and that the lien created thereby is not discharged by the transfer of the vessel.

Mr. Fletcher, for claimants.

I. The district court has no jurisdiction of the case, for two reasons: (1) Because the bond was executed by the owners at home. (2) Because it is not a bottomry bond. It is not disputed in England, that the admiralty courts have no jurisdiction of bottomry bonds, made by an English owner in England. Abb. Shipp. 121. In this country the law is the same. Such an opinion is expressed by Chase, J., in Blaine v. The Charles Carter, 4 Cranch [8 U. S.] 328; and the same doctrine has been expressly held in another case, Forbes v. The Hannah [supra]. See, also, Story's notes to Abb. Shipp. pp. 108, 121. Where a bottomry bond was given by the master of a vessel and also part-owner, and having a power from the other part-owner, for a pre-existing debt, and not for necessary supplies of the vessel. it was held that it could not be enforced in a court of admiralty, though it might be proceeded upon in a court of common law. Hurry v. The John & Alice [supra]. See, also, Hurry v. Hurry's Assignees [supra]. The case of material men, &c. is somewhat analogous. Persons, furnishing repairs or supplies for a foreign vessel, have a lien which they can enforce by admiralty process. But persons, repairing or furnishing supplies for a vessel in the port or state to which she belongs, have only such a lien as the state laws give them, and cannot resort to admiralty to enforce it. See Story's note to Abb. Shipp. 116.

The other ground of want of jurisdiction, that this is not a bottomry bond, need not be considered separately, as all the authorities fall equally well under the next point. The case of Wilmer v. The Smilax [supra], has been cited on the other side, to show, that the admiralty courts take jurisdiction of bonds made by the owner at home. But the question of jurisdiction does not appear to have been started in the case, and it was decided in the district court by Judge Winchester.

II. The instrument in question is not a bottomry bond—and did not operate as an hypothecation of the brig to the Tremont Insurance Company. In taking this position,

I would not be understood to say, that the instrument has no validity whatever. It is good between the parties to the instrument, as a personal obligation for the payment of the money and the marine interest, and would give the insurance company the same rights as another mortgage, i. e. as long as the property continued in the Flints after the year, the insurance company would have a right to take it as a mortgagee; but I contend, that as against bonâ fide purchasers, the insurance company stands in no better position than a common mortgagee. The very nature of a bottomry bond requires, that the money loaned should be laid out upon the vessel, or for the voyage. The great privileges, belonging to the holders of such bonds upon the vessel, are given, because they have enabled the vessel to carry on the voyage; and because their money has contributed to the success of the enterprise. The contracts of bottomry and respondentia have been used for several thousand years. They were used by the Greeks and the Romans, and their nature has always continued the same. It has always from the very beginning been of the essence of these contracts, that the money borrowed should be used for the purposes of building or repairing the vessel, or of the voyage. Among the Romans, the pecunia nautica or trajectitia, was money lent to be employed in a voyage. "Contractus nauticus, seu trajectitiae pecuniae, ille est, quo pecunia alicui creditur; hac lege, ut, si aut ipsa pecunia aut merces ex ea comparatae navigatione perierint, periculum sit creditoris, qui nihil hoc casu recepturus erit." "Trajectitia ea pecunia est, quae trans mare vehitur; caeterum si eodem locum consumatur, non erit trajectitia. Sed videndum an merces ex ea pecunia comparatae, in ea causa habeantur; et interest, utrum etiam ipsae periculo creditoris navigent, tunc enim trajectitia pecunia fit." Poth. Pand. Just. L. 22, tit. 2, art. 1. Bynkershoek considers the Roman law de nautico faenore, the origin of maritime laws on bottomry and respondentia. Quest. Jur. Priv. 1. 3, c. 16. The contract "à la grosse," as the French call it, embraces both bottomry and respondentia. Pothier, the most accurate of all legal writers, defines it as follows: "A contract, by which one of the parties lends the other a certain sum of money, on condition, that in case of the loss of the property on account of which (les effêts pour lesquels) the money has been lent, by some peril of the sea or vis major, the lender cannot reclaim his money," &c. Poth. Traité du Contrat de Prêt à la Grosse, art. 1, note 1. This definition is adopted by Emerigon (volume 2, p. 385) and Boucher (page 315). Emerigon, who has treated of this contract with greater fulness and research, than any other writer within my knowledge, demonstrates, that the money must be used for the purposes of the vessel, or the voyage, in various passages. He says, that in Italy money can be lent à la

grosse, in the form of a wager. "If the ship agreed on arrives, the capital and marine interest are due to the lender, and if the ship is lost, he loses both, although the borrower may not have employed the money received in the voyage, and has nothing at risk." "All this is prohibited among us. It is of the essence of the contract à la grosse, that the money should be employed for some purpose, which exposes it to the perils of the sea; and it is necessary, that in case of loss, the borrower had there, on his account, property to the amount of the sum borrowed." 2 Emerig. 392. Boucher (note 1180) adopts the foregoing emphatic words: "If the borrower uses the money on shore, without exposing it to the risks of the sea, it ceases to be a contract à la grosse, although it may be termed so in the instrument." 2 Emerig. 393, 396. "Money procures articles, which we wish to send or carry beyond sea; and without money a ship cannot get out of port. This is the reason, why so great privileges are given to the contract à la grosse. But as soon as a ship has set sail, the public interest is accomplished, and it is no longer necessary to grant such privileges to an enterprise already executed. Our ordinance, which permits insurance before or during the voyage, does not repeat the same provisions in regard to this contract. So far from it, the privilege given by the article 7 h. t. is not given on the hull, except to those, who have advanced their money for the necessities of the voyage; and is given on the cargo only to those who have furnished their money to make it (pour le faire)." Id. 484; Hall, Mar. Loans, 136. Emerigon next controverts the opinion of Valin, who says it is of little importance whether the lending be before or after the departure of the vessel, on the ground, that the presumption is, that money has been beneficially employed for the thing put at risk, or has paid what was due on this account. "But this presumption," he says, "would go too far, for here the interest of third parties comes in question; and privileges are to be construed very strictly. I think, therefore, that a third party would have sufficient ground for resisting the pretended preference of the lender, whose contract was entered into after the risk commenced." 2 Emerig. 484. After citing a case on the subject, he proceeds: "After the sailing of the ship, nothing prevents the borrowing of money, and assigning in payment the interest at risk: but this assignment does not give the creditor any right in the thing, (droit real) or privilege on the thing. The money is not truly trajectitia, unless the property at risk has been acquired by means of the money borrowed. 'Trajectitia ea pecunia est quæ trans mare vehitur. Sed videndum an merces ex ea pecunia comparatae, in ea causa habeantur; et interest, utrum etiam ipsae periculo creditoris navigent, tunc enim trajectitia pecunia fit.' L. 1 ff. de naut. faen. Now the borrowing, after the sailing of the

vessel, has not procured the cargo already at risk, 'merces ex ea pecunia comparatae non fuerunt.' The money is not trajectitious. The presumption of which M. Valin speaks is contrary to the text of the law; it would give rise to the greatest abuses." Id. 484, 485. Bynkershoek gives a case of a contract called a "bottomry," by which the owners and master of a vessel conveyed her to two merchants, to secure them for a loan. They afterwards sold the vessel; and the purchaser held her by the decree of the court of Holland, free from the claim of the two merchants. One of the reasons, in support of the decision, whether his own or the court's does not appear, was that the money was not borrowed in necessitate itineris. Quest. Jur. Priv. L. 3, c. 16. The principles of the English law are the same as the French and the Roman, and have always been recognised as such. "Bottomry," says Blackstone, "(which originally arose upon permitting the master of a ship, in a foreign country, to hypothecate the ship in order to raise money to refit) is in the nature of a mortgage of a ship; when the owner takes up money to enable him to carry on his voyage, and pledges the keel or bottom of the ship (partem pro toto,) as a security for the repayment." 2 Bl. Comm. 457. "Bottomry is a contract in the nature of a mortgage of a ship, on which the owner borrows money to enable him to fit out the ship or to purchase a cargo for the voyage proposed, and he pledges," &c. 2 Marsh. Ins. 733, Park, Ins. 410, and Hughes, Ins. 451, give similar definitions. So 1 Holt, Shipp. 419. Marshall, in comparing bottomry and insurance, says, "In bottomry the lender furnishes the borrower with the money to purchase the goods which are put at risk." 2 Marsh. 737, 738. Lord Tenterden, also, in his treatise on Shipping, (page 118), evidently has the same idea, that when the owners borrow money it must be to raise money for the purposes of the voyage. The form of a bottomry bill in Beaw. Lex Merc. 144, given by the owner and master, recites that he is necessitated to take up money, upon the adventure of the ship, for setting forth the said ship to sea, and furnishing her with provisions. So in the forms of bottomry and respondentia bonds, given by 2 Magen, Ins. pp. 431, 433, the object of the loan is recited.

The cases on the subject of bottomry and respondentia, in England and this country, are not numerous. Much the greater part of them, are cases, where money had been advanced to captains in foreign ports, and they bottomried the ships as security. All the cases in the English admiralty reports, I believe, are of this kind. Lord Stowell remarks, that these bonds "are usually given, for the payment of repairs and other necessary expenses incurred in foreign parts, where the owner and captain have no personal credit." The Zodiac. 1 Hagg. Adm. 325. I am not aware of any case, English or American, in which a bottomry bond has

been supported, where it was given by the owner, for a debt not connected with his vessel or her navigation. It seems every where taken for granted, that money lent on bottomry must be used for the vessel or the voyage. Thus, in the case of The Mary [supra], Thompson, J., says, in speaking of the difference between the power of the master and the owner, that the owner "has the absolute control over his property, and has a right to pledge his vessel for money borrowed for any purpose, to be applied to repairs, outfits, or other necessaries, or to the purchase of a cargo." Here, it is evidently taken for granted, that these were the only purposes, for which an owner could bottomry his vessel. The foundation of the contract of bottomry is, that the lender has contributed to build, purchase, or preserve the subject on which he claims a lien, which could not have been done without his aid. It is for this reason, that he has peculiar privileges. He has been the benefactor of the property. No reason of this kind applies to the instrument now in question. The ship was at sea on a voyage home, and the libellants cannot in any manner have contributed to preserve the ship, or enable her to prosecute her voyage. They are common lenders of money, and have taken a mortgage of the ship, to secure their loan. The circumstance of their also insuring the ship by the same instrument, does not, according to well-settled principles, alone make it a bottomry bond. They are mere mortgagees, and whether they have any lien against the respondents, must depend upon the principles of mortgages, not of bottomry bonds. Now, they have never recorded their mortgage, under the statute of Massachusetts (1832, c. 157, § 1). It is therefore void. If, however, the court should be of opinion, that the instrument ought to be called a "bottomry bond," and so comes within the exception of the statute, still I contend, that it is a bottomry of a peculiar kind, not entitled to any peculiar privileges, and that the libellants could have no lien without proving a delivery. All the objections to secret liens on property, apply to this instrument—while none of the reasons in favor of bottomries, on account of advances for the vessel or voyage, plead in its behalf.

Lord Tenterden says, that where owners in England pledge their vessels by bottomry, the holders of the bond cannot resort to admiralty, and then proceeds—"If the contract relate to a British ship, and purport to be, either a present assignment of the ship, liable to be defeated on repayment of the money due at the end of the voyage, or a future assignment, to take effect only upon failure of such payment, it seems, that a compliance with the provisions of the register acts, in regard to the transfer of property in ships, is essential to the validity of the contract." Abb. Shipp. 121. The case of Conard v. Atlantic Ins. Co., 1 Pet. [26 U. S.] 386, has

been cited on the other side, to show, that the circumstances of a respondentia loan being made, while the vessel was at sea, and for purposes not connected with the voyage, did not prevent the lender, from having a lien on the property, and holding it against another creditor, viz. the United States, who had levied on the goods, before they came into the possession of the lenders of the money. The authority of this case is not questioned. But the case does not decide, that the respondentia bond gave any lien on the goods. It was the endorsement of the bills of lading to the lenders of the money, which was considered as giving them a title to the goods. No doubt the respondentia bond was valid to secure the loan and maritime interest; but there is nothing in the case, which would lead to the conclusion, that it would itself have given a title, to the goods against bona fide purchasers or attaching creditors. In the present case, the validity of the bond is admitted, as far as it is a personal obligation for the payment of money; but it is denied, that it gave any lien on the ship against a bona fide purchaser. To make the case parallel with Conard v. Atlantic Ins. Co. [supra], the Tremont Insurance Company should have had a bill of sale of the vessel, and a new register, in which case their title to the ship would not have been disputed. In the arguments, in the case of Conard v. Atlantic Ins. Co., most of the authorities on both sides will be found. The great length of time, for which the loan in this case was made, is a strong objection to the bond. It was subjecting the vessel to a secret lien for a great length of time. Though bottomry loans may be made on time, as well as for a voyage, the argument of inconvenience is very strong in this case. There was no right of action, when this libel was filed. The bond was not due till January 6, 1835. The libel was filed, Oct. 1834. There had then been no breach of the agreement.

STORY, Circuit Justice. This is the case of a libel against the brig Draco, upon an asserted bottomry bond. The claimants, Messrs. Stanton, Nichols & Whitney, assert in themselves a title as vendees, and other matters of defence, upon which I shall presently have occasion to comment. In the progress of the cause the vessel was delivered on bail to the claimants upon the usual stipulation; and certain amendments and additions have been made in the libel and answer, with which matters it is unnecessary to intermeddle, until other more important and grave matters are disposed of, which are preliminary in their nature. The cause has been exceedingly well argued on both sides; and I shall now proceed to pronounce the opinion of the court. The asserted bottomry bond is certainly, in its form and actual structure, new in this court; and it has stipulations, which are not to be found in any of those, which

have been matter of controversy (at least as far as I have knowledge) in any of the English or American courts. I am, indeed, informed at the bar, that it is of very recent origin, although not at present uncommon in the commercial transactions of the metropolis of this state. On this account, and also, because it constitutes the basis, on which much of the argument at the hearing rests, I shall recite its contents in the very terms of the instrument. (Here the judge recited it verbatim.) The case, then, presented for the consideration of the court is that of an asserted bottomry bond in the form abovementioned, made by citizens of the state of Massachusetts, in the home port of the vessel, in favor of a corporation created under the authority of a charter from the government of the same state. It bears date (as we have seen) in January, 1834, and the present suit was brought in October of the same year, before the period stipulated for the termination of the risk, according to the terms of the instrument, had expired.

The first question arising in the case is that of the jurisdiction of the district court, sitting in admiralty, over the instrument as a fit foundation for a proceeding in rem. It is not doubted, that the jurisdiction exists as to all bottomry bonds executed abroad, either by the master or owner, where such bond is given to obtain supplies for the ordinary exigencies of the ship and the voyage, to enable her to complete it; as for repairs and outfits, and the discharge of the debts and charges on the ship or adventure. But it is denied, that the present is a bottomry bond, or maritime hypothecation, in the sense of the general maritime law, upon which admiralty process lies; and in support of this objection various grounds have been relied on, which I shall presently consider. And, in the first place, it is objected, that the bond was executed by the owners in the home port; and upon such an instrument no admiralty process lies, even supposing it to be in all other respects a bottomry bond or maritime hypothecation. In regard to bottomry bonds executed abroad by the owners in person, instead of the master, no objection has been suggested in the present argument; and I confess myself wholly unable to comprehend, how any objection could, in point of law, be reasoned out to overthrow their validity. Lord Stowell has expressly affirmed it. The Barbara, 4 C. Rob. Adm. 1, 2. Mr. Justice Thompson, in an elaborate opinion, has maintained the jurisdiction upon grounds, which seem to me entirely satisfactory and conclusive. The Mary [Case No. 9,187]. And it is perfectly clear, that securities of that sort, made at the home port, are valid and obligatory, as bottomry claims, in the state of Massachusetts; for the legislature have, in the general act defining the duties, powers, and restrictions of incorporated insurance companies (act of 1817, c. 120), expressly authorized such companies "to loan

to any citizen of this state any portion of their capital stock, not exceeding one half, on respondentia or bottomry." The bottomry bonds here alluded to plainly include loans in the home port to citizens upon the common maritime risks. And this is, as I conceive, entirely conformable to the established doctrine in all maritime countries (at least as far as my researches extend,) ancient and modern. By the Roman law, owners, as well as the master, could clearly hypothecate for a maritime loan, as we shall abundantly see hereafter: and in no modern commercial nation has the power been denied to the owner, where it could be exercised by the master. But, on the contrary, it could be exercised by the owner in cases, where the master could not exercise it. This is certainly true in relation to Scotland, France, Holland, and Italy, and all the other principal commercial nations of continental Europe. See 2 Emerig. Traitè a la Grosse, c. s. 1, s. 2, s. 3; 2 Valin, Comm. lib. 3, tit. 5, arts. 1, 2, 7; Poth. Traitè a la Grosse, notes 1, 7, 9; Bynk. Quest. Priv. Juris. bk. 3, c. 16; Jac. Sea Laws. c. 1, pp. 8–10; Code de Commerce de France, arts. 321, 322; 2 Bell, Comm. bk. 3, pt. 1, c. 5, arts. 459, 460, § 1; Dig. lib. 22, tit. 2; Code, lib. 4, tit. 83. And in England the principal writers, who give a description of bottomry, mention it as a contract of the owner, without any reference at all to the master. We shall see, that so is the description of Mr. Justice Blackstone in his Commentaries (2 Bl. Comm. 457), which will be hereafter cited. Mr. Marshall, follows almost the very words of Blackstone, saying, "Bottomry is a contract in the nature of a mortgage, on which the owner borrows money to enable him to fit out a ship, or to purchase a cargo for a voyage proposed; and he pledges the keel or bottom of the ship (pars pro toto,) as a security for the repayment;" and Mr. Park uses similar language. 2 Marsh. Ins. bk. 2, c. 1, p. 733; Id. c. 2, p. 740; Hughes, Ins. c. 17, pp. 451, 452; 2 Browne, Civ. & Adm. Law, 196, 197; Park. Ins. (6th Ed. 1809) c. 21, p. 552. See, also, Lord Stowell's opinion in The Zodiac, 1 Hagg. Adm. 326. Lord Stowell, in his elaborate judgment in The Atlas, 2 Hagg. Adm. 53, copies the very language of Mr. Marshall, as the common and true definition of the contract of bottomry. Lord Tenterden, in his treatise on Shipping (Abb. Shipp. pt. 2, c. 3, §§ 17, 21), treats expressly of bottomry contracts made by the owners, as well as by the master, and without the slightest distinction, as to their being equally entitled to that character. So that, either upon the principles of the general maritime law, or of the local law, there can be no reasonable doubt, that a bottomry contract, made by the owner in the home port, is, in a just and accurate sense, entitled to that distinctive appellation.

Whether upon contracts so made in the home port, a remedy lies in the admiralty in rem is quite a different question. Lord Tenterden, in his excellent treatise on Shipping (Abb. Shipp. pt. 2, c. 3, § 21), seems to have thought, that no such remedy does lie, founding himself entirely upon a dictum of Lord Holt in Johnson v. Shippen, 2 Ld. Raym. 983, and a dictum of Mr. Justice Lawrence in Busk v. Fearon, 4 East, 319, not however reported in the case. The dictum in each of these cases was purely extra-judicial; and the latter was probably founded entirely upon the former, which was given at a period, when the contest for jurisdiction between the courts of common law and the court of admiralty was maintained with great zeal and pertinacity on each side, flagrante bello. If I might venture, therefore, to make the remark, "pace tanti viri," I should say, that an obiter dictum, under such circumstances, even of so great a mind, is entitled to very little weight. Indeed, the dictum seems, when correctly examined, to import no more, than that the law will not, under such circumstances, imply an hypothecation, since the owner may give a positive security. And this distinction is most important; for in the case of Justin v. Ballam, 2 Ld. Raym. 805, it was held, that for the repairs of a foreign ship in England no implied hypothecation exists, (a doctrine, which has been overthrown by the supreme court of the United States);[2] but if an actual hypothecation or positive security on the ship was given there (it seemed admitted,) a remedy to enforce it would lie in the admiralty. So it was expressly held by the same court in Benzen v. Jeffries, 1 Ld. Raym. 152. Now, in the case at bar, there is, by the very terms of the instrument, an express and positive hypothecation, by way of mortgage and assignment of the brig, for the security of the loan and interest. And I do not perceive, how any sound distinction can be taken between an express hypothecation by a master, or by an owner in such a case, since the same objection applies to each, that it is executed within the realm, and on land, and therefore not within the admiralty jurisdiction as a maritime hypothecation.

The observations of the supreme court of the United States, in the case of Blaine v. The Charles Carter, 4 Cranch [8 U. S.] 332, merely apply to the case of an implied hypothecation, where the loan is made in the home port. "In the case of a bottomry bond, executed by an owner in his own place of residence (say the court,) the same reason does not exist for giving an implied admiralty claim upon the bottom (of the ship); for it is in his power to execute an express transfer or mortgage." But not the slightest doubt was

---

[2] The Aurora, 1 Wheat. [14 U. S.] 96, 106; The General Smith, 4 Wheat. [17 U. S.] 438; Peyroux v. Howard, 7 Pet. [32 U. S.] 341; Turnbull v. The Enterprize [Case No. 14,242]; Clinton v. The Hannah [Case No. 2,898]; and Shrewsbury v. The Two Friends [Id. 12,819],—were all on implied hypothecations brought by material men for services, &c., in the home port.

expressed, that, if the bond was truly a bottomry bond, and an express hypothecation or mortgage was included in its terms, there would be a remedy in rem in the admiralty to enforce it. On the contrary, the doctrine repeatedly held by the supreme court of the United States, in later cases, has been, that where the contract is clearly of a maritime nature, and the local law gives a lien on the ship as a security, (and a fortiori, the rule applies, where there is a positive hypothecation or security given by the party. See Benzen v. Jeffries, 1 Ld. Raym. 152; Justin v. Ballam, 2 Ld. Raym. 805; Johnson v. Shippen, Id. 983). There the admiralty has jurisdiction in rem to enforce it. Such was the doctrine held in the case of The General Smith, 4 Wheat. [17 U. S.] 443; and it has been fully recognized in the late case of Peyroux v. Howard, 7 Pet. [32 U. S.] 341. The ground of the doctrine is, that the admiralty has a general jurisdiction over maritime contracts connected with navigation and foreign trade; but it cannot enforce them by a proceeding in rem, unless the local law attaches a lien on the thing as a security. The case of Wilmer v. The Smilax [Case No. 17,777] is directly in point as to the jurisdiction. It was a case of an express hypothecation of the ship on bottomry; and Judge Winchester, a most learned and pains-taking judge, than whom few have studied the admiralty jurisdiction with more care, or administered it with more ability, did not hesitate to sustain the jurisdiction, although the money was loaned to the owner in the home port. The case of Corish v. The Murphy, 2 Browne, Civ. & Adm. Law, 530, Append., was a case of a bottomry bond in the home port; and after a very able argument, the jurisdiction was sustained. Mr. Justice Thompson, in the case already alluded to, (The Mary [supra]), has placed the subject in a very clear and strong light. After having stated, that he saw no distinction as to the admiralty jurisdiction, whether the bond was made by the owner or the master, he said that the delegation of admiralty and maritime jurisdiction by the constitution of the United States was broad enough to embrace all maritime contracts, and that all civilians and jurists agree, that marine hypothecations fall under this denomination. He then added: "And why should there, upon principle, be any difference as to the jurisdiction of the court, whether the bottomry bond is given by the owner or by the master? If the jurisdiction depends upon the subject-matter of the contract, this is the same, whether the pledge is given by the one or the other. The object and effect of the bond are the same in both cases, creating a lien upon the vessel." The case of The Barbara, 4 C. Rob. Adm. 1, goes far to sustain the same doctrine; and it was there stated by counsel, that the cases respecting domestic bonds, in which a prohibition had been granted, had been chiefly concerning bonds given by the master solely as master.

The case of Hurry v. The John & Alice [Case No. 6,923], is, I am aware, the other way. But it was made at a period, when the admiralty jurisdiction was not as well understood and defined, as it has since been by the supreme court of the United States, and when the learned judge, who decided it, had very little experience in maritime causes. That case cannot stand, unless upon the ground, that a bottomry bond given by an owner, in a foreign port, is not cognizable in the admiralty; a doctrine, which is inconsistent with what I cannot but now think to be an established doctrine in our admiralty courts. In Menetone v. Gibbons, 3 Term R. 269, Mr. Justice Buller said, that the form of the bottomry bond does not vary the jurisdiction. The question, whether the admiralty has or has not jurisdiction, depends on the subject-matter. And Lord Kenyon, on the same ground added, that it would be highly inconvenient, if the admiralty had not jurisdiction in such cases, because that court proceeds in rem, whereas the courts of common law can proceed only against the parties. I do not cite this language as being founded on a case, like the present, (for it was the case of a bottomry bond made by the master in a foreign port); but to show the true ground of the admiralty jurisdiction, it being a maritime jurisdiction, and the true nature of it, a proceeding in rem. My own opinion has been long unequivocally expressed, that the admiralty has a rightful jurisdiction over all maritime contracts in personam; but that in cases of that sort it cannot proceed in rem, unless there be a maritime lien, or a positive pledge as security. And, therefore, I have no difficulty in overruling the objection, that the admiralty jurisdiction does not extend to bottomry bonds, given by the owner in the home port, where there is an express pledge as security.

Another objection is, that the bond in this case cannot be deemed to be, in the sense of the maritime law, a bottomry bond. In the first place, it is said, that the very nature of a bottomry bond requires, that the money loaned should be for the necessities or use of the ship for the voyage, as for instance, to purchase a cargo, to repair the ship, or to obtain outfits. The expenditure must be for or on the property; or, to use the expressive language of the counsel for the claimants, the bottomry lender must be a benefactor of the property. If, therefore, the money be lent, while the vessel is at sea, for other purposes, and not to be employed on the vessel, or for the voyage, although it may be (if the words of the instrument are sufficient for this purpose) a valid mortgage, it is not a maritime hypothecation. There is no doubt, that the language used in books of authority countenances this objection, though it is by no means certain, that the authors had in view any such qualification, as it professes to define and enunciate. Their language is rather intended to be descriptive of the most

common forms and occasions of the instrument, than to express the true nature and definition of it. Thus, Mr. Justice Blackstone, in his Commentaries (2 Bl. Comm. 457), says: "Bottomry (which originally arose, from permitting the master of a ship, in a foreign country, to hypothecate the ship, in order to raise money to refit,) is in the nature of a mortgage of a ship; when the owner takes up money to enable him to carry on his voyage, and pledges the keel or bottom of the ship (partem pro toto) as a security for the repayment. In which case it is understood, that if the ship be lost, the lender loses also his whole money; but if it returns in safety, then he shall receive back his principal, and also the premium or interest agreed upon, since it may exceed the legal rate of interest. And this is allowed to be a valid contract in all trading nations, for the benefits of commerce, and by reason of the extraordinary hazard run by the lender. And, in this case, the ship and tackle, if brought home, are answerable, as well as the person of the borrower, for the money lent, &c." And after speaking of respondentia bonds, he adds: "These terms are also applied to contracts for the repayment of money, borrowed not on the ship and goods only, but on the mere hazard of the voyage itself; when a man lends a merchant £1000, to be employed in a beneficial trade, with condition to be repaid with extraordinary interest, in case such a voyage be safely performed; which kind of agreement is sometimes called 'faenus nauticum,' and sometimes 'usura maritima.'" And here it may be remarked, that the learned author makes not the slightest scruple in holding a bottomry bond by the owner to be binding on the ship, as a maritime hypothecation. But, taking the whole language together, it is manifest, that he did not contemplate, that the money must necessarily be laid out for or in the ship, to constitute a genuine bottomry contract. This sort of contract was well known to the ancients, and in the Roman law, it was called "trajectitia pecunia," or "faenus nauticum." The civil law gave this description of it: "Trajectitia pecunia est, quae trans mare vehitur; caeterum, si eodem locum consumatur. non erit trajectitia. Sed videndum, an merces ex ea pecunia comparatae, in ea causa habeantur? Et interest, utrum etiam ipsae periculo creditoris navigent: tunc enim trajectitia pecunia fit." Dig. lib. 22, tit. 2, 1. 1. But cases are put in the Pandects, which plainly show, that there are other cases, which fall within the same denomination, where the loan is not employed in the purchase of the identical goods; but the risk only is taken on them. Thus, the case is put of money lent on a pledge of goods in different ships, some of which have been already pledged to other lenders. "Faenerator, pecuniam usuris maritimis dando quasdam merces in nave pignori accepit; ex quibus si non potuisset totum debitum exsolvi, aliarum mercium aliis navi-

bus impositarum, propriisque foeneratoribus obligatarum, si quid superfuisset, pignori accepit; quaesitum est, nave propriâ peremptâ, ex qua totum solvi potuit, an id damnum ad creditorem pertineat, intra praestitutos dies amissâ nave? An ad caeterarum navium superfluum admitti possit? Respondi. Alias, quidem pignoris diminutio, ad damnum debitoris, non etiam ad creditoris, pertinet. Sed cum trajectitia pecunia ita datur, ut non alias petitio ejus creditori competat, quam si salva navis intra statuta tempora pervenerit, ipsius crediti obligatio, non existente conditione, defecisse videtur." Dig. lib. 22, tit. 2, 1. 6. An answer, that presupposes, that the money may be lent, not only upon goods purchased with it, but upon the ship itself on the risk of the voyage. The succeeding law demonstrates this still more fully, and shows, that a bottomry bond might exist, although the loan was merely on the risk of the ship for the voyage. "In quibusdam contractibus etiam usurae debentur, quemadmodum per stipulationem. Nam, si dedero decem trajectitia ut, salvâ. nave, sortem cum certis usuris recipiam, dicendum est, posse me sortem cum usuris recipere." The trajectitia pecunia of the Roman law, was not so entirely confined to money lent for the ship, or for goods to be put on board the ship, as we might at first view suppose; though, doubtless, in the simplicity of the commerce of those times, this was the most common object of the transaction. The Code (liber 4, tit. 33, 1. 3,) puts a case, illustrating the principle, of which it is only necessary to state the introductory part, "Cum proponas te nauticum faenus ea conditione dedisse, ut post navigium, quod in Africam dirigi debitor adseverabat, in Salonitanorum portum nave delata, faenebris pecunia tibi redderetur, ita ut navigii duntaxat, quod in Africam destinabatur, periculum susciperes," &c. Emerigon, when rightly understood, confirms this opinion. "That which we call money lent upon maritime loans (a la grosse,)" says he, "was called by the Romans, 'pecunia trajectitia;' not that it was merely lent to the borrower of it, to be transported to another place, but because it was lent to the borrower to employ it in his maritime commerce upon the obligation of returning it in case of a successful voyage with the stipulated nautical interest, and upon the condition, that, if the ship was lost by a peril of the sea, in the course of the voyage, the borrower should not be obliged to return either principal or interest." Emerig. Traité des Contrats a la Grosse, c. 2, tom. p. 384 (406), b; Id. § 2, note 2. Emerigon adds, that it is called in France, "a la grosse aventure," because the lender exposes his money to the accidents of the sea; and he contributes to gross or general averages. The definition of Pothier, which is adopted by Emerigon, is quite as comprehensive. "The contract of a maritime loan (a la grosse aventure,)" says he, "is a contract; by which the lender lends to the borrower a certain

sum of money upon condition, that in case the loss of the effects, on account of which it is lent, taking place by any peril of the sea, or superior force (vis major,) the lender shall not be repaid, unless to the amount of what shall remain." Poth. Traité du Pret a la Grosse Aventure, art. 1, note 1.

If we pursue the definitions of these authors into the analysis, which follows, we shall perceive, that they nowhere intend to insinuate, that it is indispensable, even under the French law, which is narrower than the law of some other countries on this subject, as for instance, Italy and England, that the money should be lent for the purposes of the ship or the voyage. See Emerig. Traité a la Grosse, c. 1, § 3. Thus, Pothier says: "Five things compose the essence of the contract: (1) That money should be lent. (2) That there should be one or more things, upon which the loan should be made, (to contradistinguish it from a mere wager on the voyage, which the French law inhibits). (3) That there should be risks, to which the things are exposed, to be borne by the lender. (4) A stipulated payment should be made by the borrower for the loan, in case of a successful arrival, as a price for the risks run, which is called maritime profit. (5) And there should be the agreement of the parties upon all these things. Now, taking this to be a complete specification of the essentials of a bottomry bond, the present possesses them all in a direct and unequivocal form; and not one of them points to the necessity of the money being laid out for or upon the voyages; but only, that the property, subject to the lien, should be at risk on the voyage." Poth. Traité a la Grosse, art. 2, note 7. Emerigon, indeed, in some places, uses language, which seems to import other distinct qualifications; as that the money should be lent for the necessities of the ship or for the voyage. But, taking its general scope, it does not seem to me to vary intentionally from the definition of Pothier; but to have a special reference to certain texts of the Roman law, or to the express provisions of the French ordinance. Valin defines the contract thus: "A maritime loan is a contract, by which the lender, in consideration of the sum, which he will lose, if the thing, upon which he has made the loan, should perish by inevitable casualty, is authorized to stipulate for an interest or extraordinary profit, in case the thing arrives at the proper port." 2 Valin, Comm. tit. 5, p. 1. And, notwithstanding the positive provision of the French ordinance, giving the privilege of maritime hypothecation for money lent on the hull and keel of the vessel for the necessities of the ship, and, the charges for the payment of the lading for the voyage, which seem to imply, that the privilege is confined to such cases, Valin insists, that it is of no consequence, whether the loan is made before or after the sailing of the vessel on the voyage, since the presumption is, that it has been usefully employed for the thing at hazard, or has been applied to debts contracted on the same account. 1 Valin, Comm. bk. 1, tit. 14, § 16, pp. 364, 366. From this doctrine, however, Emerigon dissents (2 Emerig. Traité a la Grosse, c. 5, § 3); not upon any ground of general principle, but upon the construction of the terms of the ordinance. Mr. Marshall, in his work on Insurance, gives the preference to Valin's opinion; and manifestly supposes, that the English law agrees with it. 2 Marsh. Ins. bk. 2, c. 3, p. 749; Id. c. 4, pp. 749, 750.

I have the rather brought into review the opinions of these eminent maritime jurists, because they were greatly relied on at the argument, as establishing the principle, that a genuine bottomry-bond is confined to money lent for the necessities of the ship, or cargo, or voyage. I agree that this seems to be the fair result of the French ordinance, but it stands positively on the text. I agree, also, that this is uniformly the case, where the master takes up money on maritime loan; but this also turns upon the nature and qualifications, and limitations of his powers as master. But I cannot admit, upon general principles belonging to the contract as a maritime loan, that there is any such limitation or qualification applicable to the case of the owners becoming borrowers. The truth is, that contracts of bottomry are not contracts importing, in all countries, precisely the same obligation and extent. And though in all commercial countries they are in use, yet the forms and operation of them are not precisely the same in different countries, but are controlled by the local laws. See The Nelson, 1 Hagg. Adm. 176; The Zodiac, Id. 325. We may apply to them the same remark, which Lord Ellenborough applied to a respondentia bond, that "it is a contract, not of a universal nature and form, but depending upon the particular form of the instrument, varying in different countries:" and, it may be added, variously modified by the municipal laws. And in the definition usually given of it by authors, they confine themselves (as has been already hinted) rather to a description of the most common forms and occasions, in which it appears, than to a strictly juridical definition. Yet it is remarkable, that Blackstone and Marshall, and Lord Stowell, in propounding a definition, speak (as we have already seen) of bottomry contracts of the owner only, omitting those of the master, which are now far more common, and strictly for the necessities of the ship.

In my opinion, there is not the slightest ground to uphold the doctrine, that, in order to constitute a bottomry bond, as such, in the sense of the maritime law, it is necessary, that the money should be advanced for the necessities of the ship, or for the cargo, or for the voyage. Where it is given by the master, virtute officii, it must, in order to

have validity, be for the ship's necessities; for the implied authority of the master extends no farther. But where it is given by the owner, as dominus navis, he may employ the money, as he pleases. It is sufficient, if the money be lent upon the bottom of the ship, at the risk of the lender, for the voyage. The true definition of a bottomry bond, in the sense of the general maritime law, and independent of the peculiar regulations of the positive codes of different commercial nations, is, that it is a contract for a loan of money on the bottom of the ship, at an extraordinary interest, upon maritime risks, to be borne by the lender for a voyage, or for a definite period. See, also, 2 Marsh. Ins. bk. 2, c. 3, p. 742; Id. c. 4, pp. 748–750. See Lord Stowell's opinion in The Atlas, 2 Hagg. Adm. 48, 52, 53, 55, 57, 58. This is the true exposition given of it by Bynkershoek, in his usual strong and masculine manner. After having remarked upon the insufficiency of the definition of Grotius, and that the contract itself had been extended since by little and little, and other and other things (paulatim ad alia, atque alia porrectus est) since the days of Grotius, he says, "Grotii definitio nec legibus nec formulis satis congrua, et multis nominibus imperfecta est." He gives his own definition in the following words; "Ut autem nunc obtinet Bodemery, definio, contractum, quo pecunia creditur magistris navium in exteris regionibus, sive Dominis navium et mercium in his regionibus, ea lege, ut, si navis pereat, creditor jus crediti amittat; si salva advenerit in locum destinatum, sors restituatur cum usuris nauticis vel majoribus vel minoribus, ut pro ratione periculi inter creditorem et debitorem convenit." Bynk. Quaest. Juris. Priv. lib. 3, c. 16. This comprehensive definition embraces precisely the same ingredients, and no more, as the essence of the contract, as are enumerated by Pothier in the passages already cited. This is precisely the view taken of it by Lord Tenterden, in one of the most recent cases, which has occurred on the subject. He considers it to be the very essence of a bottomry bond, as contradistinguished from any other bond, that it is for money taken up on maritime risks, at the hazard of the lender. Simonds v. Hodgson, 3 Barn. & Adol. 50, 56.

Mr. Bell, in his valuable Commentaries upon the Commercial Law of Scotland (2 Bell, Comm. p. 83, c. 5, art. 460, § 1), has given a definition substantially the same, which, he says, contains the essence of the contract, as defined by all the great writers upon maritime law. He says, that, "by the contract of bottomry or respondentia, money is, in contemplation of a particular voyage, lent to the master of a ship in a foreign country, or to the owner of the ship or cargo in a home port; on this condition, that if the subject, on which the money is taken, is lost by sea risk or superior force, the lender shall lose his money; and that if the voyage shall be successful, the sum shall be re-paid, with a certain profit or consideration for interest and risk, as agreed upon." And this is clearly the view taken of the contract by the supreme court of the United States, in the case of Conard v. Atlantic Ins. Co., 1 Pet. [26 U. S.] 436, 437, where the very objections were taken, which have been taken in this case. That, indeed, was the case of a respondentia bond. But upon this point, none of the authorities cited in support of the objections make any distinction between bottomry bonds and respondentia bonds; but they profess to hold both to be governed by the same rules. The objections were, first, that the loans were made after the sailing of the ships on the voyage; secondly, that the money loaned was not appropriated to the purchase of the goods put on board, and was not the identical property, on which the risk was run. What was the language of the supreme court, in reply to these objections? "In our opinion, neither of these objections can be sustained. It is not necessary, that a respondentia bond should be made before the departure of the ship on the voyage, nor that the money loaned should be employed in the outfit of the vessel, or invested in the goods, on which the risk is run. It matters not at what time the loan is made, nor upon what goods the risk is taken. If the risk of the voyage be substantially and really taken; if the transaction be not a device to cover usury, gaming, or fraud; if the advance be in good faith for a maritime premium; it is no objection to it, that it was made after the voyage was commenced, nor that the money was appropriated to purposes wholly unconnected with the voyage." Now, the doctrine here stated, which was the unanimous opinion of the court, is, in my judgment, perfectly conclusive upon the point stated. And I am entirely satisfied, upon a review of the principles upon which it is founded, that it cannot be shaken but by overthrowing principles deeply settled and fixed in the maritime law. I find, too, that my learned friend Mr. Chancellor Kent, adopts this view of the subject, as the true and satisfactory doctrine on the subject. 3 Kent, Comm. Lect. 49, (2d Ed.) pp. 361, 362.

It is also objected, that if the bond is a good bottomry bond, still it is one of a peculiar nature, and does not give any maritime privilege or lien on the vessel; but it is to be treated as a case of a mortgage at the common law. If treated as a mortgage, it is said to be void as against the registration act of Massachusetts, respecting personal property; and if not, still there would be no lien without a delivery of possession, which has not been done. In regard to the terms of the bottomry bond, it is certainly true, that they are of a peculiar nature; but still their import is undeniably, that the loan is upon maritime risks, the ordinary risks in policies of insurance, and the property was at the time of the loan in the borrowers. There are therefore, all the proper ingredients of a

bottomry bond. And as to collateral matters, not displacing these, there can be no doubt, that they constitute grounds of contract, which the parties may modify according to their own pleasure. With respect to the privilege or lien, it is not a case depending upon the effect of any implied hypothecation under the maritime law; for there is an express mortgage and assignment, which is a positive hypothecation; and it being as clear, that it is for maritime risks, it follows of course, that it is a maritime hypothecation, which, in legal contemplation, is neither more or less than a maritime mortgage.

The other point, as to the necessity of registration, depends merely upon the statute of Massachusetts of 1832, c. 157, which provides for the registration of mortgages of personal property. That statute contains the following exception and proviso: "Provided, that nothing herein contained shall affect any transfer of property under bottomry or respondentia bonds, or of any ships or goods at sea, or abroad, if the mortgagee shall take possession thereof, as soon as may be, after the arrival of the same in this commonwealth." As I understand this section, it expressly excepts from the operation of the statute, all transfers under bottomry or respondentia bonds; and the qualification, as to taking possession, is exclusively applied to other cases of transfer of any ship or goods at sea or abroad, by way of mortgage. And this exception is the more reasonable and just; because possession is not usually contemplated to be taken under a bottomry or respondentia bond; and a term of time after the arrival of the ship is often allowed for payment, before any proceedings can be had to enforce any right in rem. If we were to construe the exception in any other manner, and make it applicable to bottomry or respondentia bonds generally, unless possession were taken on the arrival of the vessel, it would create great public inconvenience, and indeed avoid the securities of bottomry and respondentia bonds in many cases; for possession cannot, under the ordinary bonds, be lawfully taken to enforce payment. Besides, the disjunctive "or," completely separates the former member of the sentence from the latter; so that we must read it, "any transfer of property under bottomry or respondentia bonds, or any transfer of any ship or goods at sea or abroad, if the mortgagee shall take possession," &c. of any such ship or goods at sea or abroad, as soon as may be after the arrival of the same. The case of a bottomry bond, being, then, (as I conceive) upon the true interpretation of the statute, entirely out of its purview, this objection, in every variety of its form and pressure, seems to me to be unmaintainable. If the lien be secret, it is nevertheless sacred; for it is such as the law allows upon its own policy. It is not pretended to be a case affected by our ship registry acts; and, therefore, it

steers wide of any objection to it, founded upon the peculiar provisions of the British Code. If, then, there was no necessity to record the instrument, and it is not within the registry acts, it can be of no consequence to the present claimants, that they purchased without notice of its existence; for such notice is not required by law, to give such a security validity against a bonâ fide purchaser. The only difficulties, which can arise, are those, which may result from there being a meditated fraud in the case (which is not here pretended;) or some laches on the part of the bottomry lender, which will, in favor of such purchaser, operate as a waiver of the lien or mortgage on the property.

Some objection has been hinted against the bottomry bond, upon the ground, that it is not for a specific voyage, but for a great length of time. But it is very clear that a bottomry bond, may be upon time, as well as for a specified voyage. Indeed, in many cases (as in case of a bottomry bond on an East India or China voyage,) the voyage may last far beyond the stipulated period in the present bond. Even in the Roman law no difference was made, whether the maritime loan was made upon a specific voyage, or for a limited time. Dig. lib. 22, tit. 2, l. 4, l. 6. And this is clearly the law of France, and of other continental maritime countries, as it certainly is of England and America. See 2 Emerig. Traité a la Grosse, bk. 1, c. 8, §§ 1, 263; 2 Valin, Comm. lib. 3, tit. 5, art. 2, pp. 4, 5; 2 Marsh. Ins. bk. 2, c. 4, pp. 748–752.

There is another objection of a very different character, which is presented against the maintenance of the present suit. It is, that the suit was commenced before the bottomry bond became due and payable according to its terms, the suit having been commenced before the year had expired, for which the loan was made. Several answers have been given to this objection. In the first place, that it is at all events maintainable for the first half year's interest, which was clearly due; in the next place, that the insolvency of the borrowers put an end to any further proceedings in the adventure on their part; and in the last place, that the sale of the vessel to the present claimants was a virtual deviation from the risks, or an extinguishment of, or a dispensation from, any further risks, under the bottomry bond, on the part of the lenders. In regard to the interest, it does not seem to me, that though payable semi-annually, it could be recoverable at law, unless the principal were also recoverable. If the brig had been totally lost after the time of the first semi-annual payment of interest had passed, and before the year had expired, nothing would have been payable on the bond, either for principal or interest, for, notwithstanding the preliminary recitals, the very condition of the bond demonstrates, that neither principal nor interest could accrue, unless upon the due ar-

rival of the brig at the expiration of the risk. The insolvency, too, has no bearing upon the case, otherwise than as it may conduce to show, that the contemplated voyage or adventure was broken up; and if it was broken up, it was so by the sale and transfer of the brig to the present claimants. The question, then, as to the breaking up of the voyage, and the consequent discharge of the libellants from any further risk, turns upon the effect of that sale and transfer. There is no doubt, that the bottomry bond originally attached by the sailing of the brig on the contemplated adventure; so that there has been a due commencement of the maritime risks, to be borne by the lenders. We may, therefore, lay out of the case all consideration of what would have been the state of things, if the maritime adventure had never, according to the contemplation of the parties, had an inception. See 2 Marsh. Ins. bk. 2, c. 4, pp. 749, 750. From the time of the execution of the bond, until the sale to the claimants, the brig was clearly at the risk of the lenders at sea and in port.

Now, in point of law, there can be no doubt, that if, after the risk on the bottomry bond has commenced, the voyage, or adventure, is voluntarily broken up by the borrower, in any manner whatsoever, whether by a voluntary abandonment of the voyage, or adventure, or by a deviation, or otherwise, the maritime risks terminate, and the bond becomes presently payable. All writers on the subject of bottomry treat this as indisputable, and governed by analogy to the law of insurance on the same subject. Emerigon, instead of discussing the subject at large, simply contents himself with saying: "All that I have said in my treatise on Insurance, upon the subject of the route, the voyage, and the places within the risk, will apply here. A voluntary change of the route, or of the voyage, discharges the lender from all ulterior risks, though the ship should return to her legitimate track." 2 Emerig. Traité à la Grosse, c. 8, § 4. And afterwards he adds: "After the risk is terminated, the borrower is bound to pay the principal and maritime interest, which he has promised." Id. c. 9, § 1. Bynkershoek lays down the like doctrine (Bynk. Quaest. Priv. lib. 3, c. 16. See, also, 1 Bell, Comm. bk. 3, pt. 1, c. 5, art. 471, § 1); and it is the established jurisprudence of England and America (2 Marsh. Ins. bk. 2, c. 4, pp. 750, 751; Id. c. 5, pp. 755–757). "In general (says Mr. Marshall) as soon as the risk ceases, (discusso periculo) either by the ship's safe arrival, the expiration of the term, or any other event, the marine interest ceases, and the debt becomes absolute." Id. He afterwards adds, in another place, that "the lender, like an insurer, is only answerable for losses, which happen within the time and place of the risk, as specified in the contract. Therefore, if the ship without necessity, deviate from the voyage described in the bond, the lender will not be liable, any

more than an insurer, to any loss, that may afterwards happen." 2 Marsh. Ins. bk. 2, c. 5, pp. 756, 757.

The state of the law being such as from these authorities it would seem clearly to be, that the risk of the bottomry lender terminates under the same circumstances which would terminate the like risks upon a policy of insurance, the question, then, arises, whether in a policy of insurance upon time the risk on the subject-matter continues, after there has been an absolute sale or transfer of the property; for such is the state of the present case, as presented by the record, and insisted on by the claimants. Now, the doctrine is, as I apprehend, very clearly established, that, upon a policy of insurance, the property insured continues at the risk of the underwriter only, while the ownership of the assured continues in the property. If he sell it, or transfer it absolutely, the policy becomes void as to any future risks, and is functus officio. This was the doctrine of the house of lords in Lynch v. Dalzell, 3 Brown, Parl. Cas. 431, and was affirmed by Lord Hardwicke in Sadlers' Co. v. Badcock, 2 Atk. 554. The same doctrine is affirmed in Marshall on Insurance (book 4, c. 2, p. 787; c. 4, pp. 800, 801, 804). The same doctrine has been repeatedly recognised in Massachusetts; and the case of Carroll v. Boston Marine Ins. Co., 8 Mass. 515, is directly in point. That was a policy on a vessel on time; and, before the loss, the vessel was sold to another person; and the court held, that no subsequent loss was recoverable under the policy. The court on that occasion said: "It has been repeatedly decided here, that, under the forms of our policies, none but the parties to the contract, or their legal representatives in case of their death, can avail themselves of the contract, although others may in fact have an equitable or even a legal interest in the property insured." Unless, then, some distinction can be shown between the case of a policy, and the case of a bottomry bond, this doctrine concludes the question. I know of no such distinction; and there is no ground in law or equity to sustain one. The vendee, in case of a sale, is not liable to the bottomry lender for either principal or interest; nor can he, on the other hand, entitle himself, as vendee, to any benefit of the bottomry bond. The sale of the vessel terminates all interest in the borrower; not only his interest in the voyage, but his power over the voyage. The bottomry bond is a contract for any voyage during the limited period, carried on by the borrower, as owner, and not ultra. And no man has a right to say, that personal confidence in the character, business, or interests of the borrower, may not have materially influenced the formation of the contract, and the undertaking of the risk.

But the present case stands upon a stronger ground; for there is certainly a direct interdiction of any such sale during the period of the risk. It is true, that the clause is con-

tained in. or rather follows, a recital, and is inartificially drawn; but it contains terms of positive and direct obligation, which the parties are estopped to deny. The clause, to which I allude, after stating the mortgage and assignment of the brig, as security, proceeds as follows: "And it is hereby declared, that the whole of the said brig is thus assigned over for the security of the bottomry taken up by the said, &c., and shall be delivered to no other use or purpose whatsoever, until payment of this bond is first made, with the premium and interest, that may become due thereon." Can it be said, with any just regard to the true meaning of the language, that this brig has not, by the sale, been delivered up to any other use or purpose, than to pay the bottomry bond? And if the brig has been so delivered up, is not the sale, in the sense of a court of equity (and such, for this purpose, a court of admiralty is, to the extent of the exercise of its own jurisdiction,) a breach of the contract? My opinion is, that the risk has terminated by the abandonment of all further rights and interests in the voyages of the brig by the transfer of the owners. And I am also of opinion, that the sale of the brig constitutes per se a violation of the contract in its substance; and therefore, that the suit is not brought too soon.

I have thus gone, at large, over the main grounds of resistance to the present claim, of the libellants, as matter fit for the cognizance and administration of an admiralty court. But it does appear to me, that, if the merits of the case are as I am of opinion they are, the escape from the admiralty court to a common law court would, to use a felicitous expression of Lord Stowell. only be to change postures on an uneasy bed. If this bottomry bond be a good mortgage at the common law, and do not require registration to give it validity (as I think it does not), then it is clear, that the legal property vested in the libellants; and if so, the sale to and use of the brig by the claimants, under an adverse title. is a conversion of the property, for which an action of trover would lie; and in such an action the libellants would be entitled to recover the full amount of the principal and interest due to them by the terms of the bond. There is, therefore, in substance, no controversy between the parties, but the simple question of priority of title; and when that is once settled, it is wholly immaterial in what court the other claims of the parties are to be adjusted. The latter are more a matter of calculation than of general discretionary damages.

The view of the case, which I have taken, renders it wholly unnecessary to examine into the other points suggested by the amended libel and answers, as to the earnings of the brig. and whether the conveyance was merely a security for a debt, or an absolute purchase. I am of opinion, that the libellants are entitled to the principal sum of three thousand dollars, lent at the maritime risk, to the premium of five per cent. on that sum, and to simple interest of six per cent. on the principal sum from the time of the sale to the claimants up to the time of this decree. If there is any question as to the amount, I shall refer it to an auditor to ascertain and adjust it. Decree accordingly.